**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

ALICIA HATFIELD,                      )
                                      )
                    Plaintiff,        )
                                      )
        v.                            )
                                      )        Civil Action No. 13-26
AMANDA BERUBE, KATHLEEN               )
TENNANT,                              )
                    Defendants.       )

## MEMORANDUM OPINION

### I.      INTRODUCTION

This civil action arises from events that transpired in connection with the removal of Plaintiff's children from her custody on March 12, 2012 and related dependency proceedings. On January 7, 2013, Plaintiff Alicia Hatfield ("Plaintiff") filed this *pro se* lawsuit for injunctive and monetary relief, naming Allegheny County Executive Rich Fitzgerald, the Mon Valley Regional Office of Allegheny County Children, Youth & Family Services ("CYF"), and various child welfare officials as Defendants. As matters presently stand, the only remaining Defendants are Amanda Berube ("Berube"), a former CYF caseworker, and Kathleen Tennant ("Tennant"), a CYS supervisor. Plaintiff's remaining federal claims against these two Defendants are asserted under 42 U.S.C. §1983 to redress the alleged violation of her Fourth and Fourteenth Amendment rights. In addition, Plaintiff asserts a state law claim for the intentional infliction of emotional distress.

This Court has jurisdiction over the matter pursuant to 28 U.S.C. §§1331, 1343 and 1367. Presently pending before the Court is a motion by the Defendants for summary judgment on all remaining claims (Docket No. 65). For the reasons set forth below, the Defendants' motion will be granted.

## II.    BACKGROUND FACTS

Plaintiff is the natural mother of four minor children, J.H., B.H., M.M., and A.F. (Defs.' Concise Statement of Material Facts, "DCSMF," ¶1.)[1]  In the fall of 2010, Plaintiff and her children were living with Steven Fey -- Plaintiff's paramour and the father of A.F. -- in a house in Homestead, Pennsylvania that was owned by Fey's mother.  (*See* Def.'s Ex. C, Pl. Dep. at 49:12-14, Docket No. 66-1; Defs.' Ex. D, Docket No. 66-2, at 5.)

In September 2010, CYF received a report that Fey had become physical with J.H., twisting his arm behind his back to the point of causing J.H. physical pain.  (*See* Defs.' Ex. D, Docket No. 66-2, at 4.)  The reporting source informed CYF that Plaintiff wanted to leave Fey but lacked the financial resources to do so.  (*Id.*)  At that time, Plaintiff reportedly agreed that Fey did grab J.H. in the manner described when frustrated.

A CYF intake worker subsequently visited the home on October 4, 2010 and discovered that the upstairs was gutted and unusable.  (*See* Defs.' Ex. D, Docket No. 66-2, at 4.)  There was no running water in the kitchen, and all the children were sleeping in one room on beds that were soiled and old.  (*Id.*; *see also* Pl.'s Ex. E, Docket No. 69-5 at 3.)  The caseworker reported that there was a crack in the living room ceiling that had tape over it and the tape appeared to be moldy.  (Defs.' Ex. D, Docket No. 66-2, at 4.)  At that point, CYF opened a case file on Plaintiff's family, and Three River Youth in-home services were implemented to assist Plaintiff

---

[1]    Much of the factual background is taken from Defendants' Concise Statement of Material Facts for Summary Judgment (Docket No. 66.)  Pursuant to Local Rule 56(C)(1), Plaintiff was required to file a separate responsive concise statement "responding to each numbered paragraph in [the Defendants'] Concise Statement of Material Facts" by "admitting or denying whether each fact . . . is undisputed and/or material; . . . ." LCvR 56(C)(1). Plaintiff failed to do so, despite this Court's express admonition, in its order of January 12, 2017 (Docket No. 64), that the parties submit their summary judgment filings in compliance with Local Rule 56.  Although Plaintiff did submit documents styled as an "Opposition to Motion for Summary Judgment" (Docket No. 68) and "Statement of Material Facts" (Docket No. 69), her submissions are not in conformity with Local Rule 56(C)(1). Consequently, any "[a]lleged material facts . . . which are claimed to be undisputed" by Defendants will be deemed admitted for purposes of resolving the Defendants' Rule 56 motion, except to the extent the alleged facts are "specifically denied or otherwise controverted" by Plaintiff's own concise statement of facts.  *See* LCvR 56(E).

with getting the water service turned on, finding her own housing, counseling Plaintiff on general parenting skills, assisting with family budgeting, and connecting the family to other community resources. (Def.'s Ex. D, Docket No. 66-2 at 4.)

In late 2010, Plaintiff's family was transferred to a caseworker with Family Group Decision Making ("FGDM"). (Def.'s Ex. D, Docket No. 66-2 at 4.) In December 2010 and January 2011, the FGDM caseworker made several unsuccessful attempts to contact the family. (*Id.*; *see also* Pl.'s Ex. E, Docket No. 69-5 at 3.)

In May 2011, CYF received a call from Plaintiff reporting that Fey was verbally abusive to her and the children. (Def.'s Ex. D, Docket No. 66-2 at 4.) Plaintiff further stated that Fey had been physical with J.H. and had inflicted bruises on the children in the past. (*Id.*) Based on Plaintiff's allegations, the FGDM caseworker attempted to complete an assessment of the family but reportedly found them uncooperative over the course of several months. (*Id.* at 4-5; *see also* Pl.'s Ex. E, Docket No. 69-5 at 3.)

On January 26, 2012, Berube was assigned to Plaintiff's family in her capacity as a caseworker for CYF. (DCSMF ¶2.) Berube's supervisor at the time was Tennant. (*Id.* ¶3.)

Berube initially attempted to contact the family by phone on February 1, 2012, but the call was not answered. (Def.'s Ex. D, Docket No. 66-2 at 5.) On February 7, 2012, she made an unannounced visit to the home. (DCSMF ¶6.) Although Berube could hear people inside the house, no one would answer the door. (Berube Decl.¶6(b), Defs.' Ex. B, Docket No. 66-1.) Subsequently, Fey arrived home and allowed Berube into the house without incident. (DCSMF ¶¶6-7; Berube Decl. ¶6(c)-(e); Pl.'s Ex. E, Docket No. 69-5 at 3.) In the course of her walkthrough inspection, Berube observed that there were only two mattresses in one room for the four children, there was once again no water service in the kitchen, and the home had a

strong odor of animal urine.  (DCSMF ¶8; Def.'s Ex. D, Docket No. 66-2 at 5.)  Plaintiff was "abrupt" with Berube and informed her she was not going to move out of the home.  (Def.'s Ex. D, Docket No. 66-2 at 5.)

Berube's second visit occurred on February 22, 2012.  (DCSMF ¶9.)  On this occasion, Fey again allowed Berube into the house and accompanied her as she conducted her walkthrough inspection.  (*Id.* ¶¶10, 12-13, 15, 17.)  During the walkthrough, Berube obtained photos of the upstairs area, which she found to be "completely gutted" with wires exposed.  (Def.'s Ex. D, Docket No. 66-2 at 5.)  According to Berube's written account of the incident, "[t]here were concerns with broken windows in the home, outlet exposures and potential dangers of the ceiling collapsing downstairs."  (*Id.*; *see also* DCSMF ¶19.)  In addition, "[t]he family [was] still not able to use water in their kitchen."  (Def.'s Ex. D, Docket No. 66-2 at 5.)  Berube informed Plaintiff that if she did not address the issues concerning the condition of the house or find new housing, the children could be removed from the home.  (DCSMF ¶20.)  Plaintiff responded that she was planning to move out of the home.  (DCSMF ¶21.)

CYF subsequently received a report on March 10, 2012 "that Plaintiff was driving around Pittsburgh with her children and [had] stated that she is tired of the abuse."  (Def.'s Ex. D, Docket No. 66-2 at 5.)  The reporting source, an in-home social services worker, informed CYF that Plaintiff "refused to go to [a] shelter with her children" and "was tired of J.H. being maltreated by Mr. Fey."  (*Id.*)

Berube made contact with Plaintiff two days later, on March 12, 2012, at which time Plaintiff "was [reportedly] vulgar with [Berube] and would not explain anything to [her]. [Plaintiff] stated that she had a plan to move out but would not share this plan with [Berube]" and hung up on her.  (Def.'s Ex. D, Docket No. 66-2 at 5.)  Berube then filed applications with

the Allegheny Court of Common Pleas Family Court, Juvenile Division, for emergency protective custody of each of Plaintiff's four children. (DCSMF ¶22; Def.'s Ex. E, Docket No. 66-2.) The various applications -- dated March 12, 2012 -- contained a common statement of allegations in support of Berube's request for emergency protective custody. (DCSMF ¶22.) The applications, which were approved and signed by Tennant, alleged the following, with respect to each child:

> [CYF] is requesting an [Emergency Custody Application] for the children due to the lack of cooperation of the parents, [domestic violence] and the safety conditions of the home. The complete upstairs of the home is gutted and wires are completely exposed. Downstairs there is a broken window in the living room. The home smells of animal urine. On 3/10/12 Mother reported to the in-home worker that she was leaving the home due to abuse that is occurring in the home by Father Steve Fey. Mother reported that she is tired of the maltreatment Mr. Fey does to [J.H.]. Caseworker spoke with Mother on 3/12/12 regarding the abuse. Mother refused to provide any information to Caseworker as to the abuse. Mother states that she is moving out of the home but would not provide any information to Caseworker. The family was not cooperative with Family Group Decision Making. This family has a history with [CYF] due to [domestic violence] and conditions of the home. It appears that [A.F.] has a speech delay.

(Defs.' Ex. E, Docket No. 66-2, at p. 12; *see also* DCSMF ¶23.)

That same day, the Honorable Cathleen C. Bubash of the Allegheny Court of Common Pleas, Family Court Division issued an order for temporary emergency protective custody of the children. (DCSMF ¶24; Defs.' Ex. F, Docket No. 66-2, pp. 16-19.) Judge Bubash found that "[s]ufficient evidence was presented to prove that continuation or return of the child[ren] to the home of Alicia Hatfield... is not in the best interest of the child[ren]" and would be "contrary to [their] welfare." (*Id.*) The court further found that preventative services were reasonably denied "due to the necessity for emergency placement," and the agency's level of effort in this regard was reasonable "due to the emergency nature of the situation, safety considerations, and circumstances of the family." (*Id.*)

Having obtained Judge Bubash's orders, Berube went to Plaintiff's home on March 12, 2012 to remove the children. (DCSMF ¶25.) When Fey answered the door, Berube informed him that she was there to remove the children and showed Fey a copy of the Judge's orders. (*Id.* ¶¶26-28; Pl.'s Ex. V, Docket No. 69-11 at 3.) Berube never entered the home on that occasion and did not personally provide Plaintiff a copy of the court's orders authorizing the children's removal. (*Id.* ¶¶29-30.) Upon their removal, the children were taken to the home of their maternal grandmother. (Def.'s Ex. D, Docket No. 66-2 at 5.)

On March 14, 2012, Plaintiff and her children were provided a shelter hearing. (DCSMF ¶31.) Plaintiff was present at the hearing and was represented by an attorney. (*Id.* ¶32.) Following the hearing, the state court ordered that the children remain in the care of their maternal grandmother pending further developments. (*See* Defs.' Ex. D, Docket No. 66-2 at 5.)

Thereafter, each of Plaintiff's four children became the subject of a separate state court dependency proceeding. (*See* Defs.' Ex. D, Docket No. 66-2 at pp. 2-8; *see also* Docket Nos. 33-1, 33-2, 33-3 and 33-4.)[2] At the dependency hearing, Berube testified concerning the family's history with CYF and with other social services agencies, as reflected in CYF's case file. (Pl.'s Ex. E, Docket No. 69-5 at 3.) Plaintiff was present for the dependency hearing and was represented by legal counsel. (*Id.*)

On April 16, 2012, the state court found each of Plaintiff's children to be a "dependent child" within the meaning of the Juvenile Act, 42 Pa. C.S.A. 6302. (DCSMF ¶ 33; Defs.' Ex. G, Docket No. 66-2 at pp. 21-24.) As a result of the proceedings, J.H. was placed in shelter care, while the remaining children were placed in kinship care with their maternal grandmother. (*Id.*)

---

[2]    These latter records from the state court proceeding were made part of the record of this case in connection with the Court's adjudication of Defendants' motion to dismiss the amended complaint. (*See* Mem. Op. dated July 27, 2016, Docket No. 39, at p.4.) For purposes of resolving the pending Rule 56 motion, the Court may consider any portion of the record that it deems material. *See* Fed. R. Civ. P. 56(c)(3).

On August 27, 2012, the state court held a permanency review hearing. (See Pl.'s Ex. F, Docket No. 69-6.) Plaintiff was again present and represented by counsel. (*Id.* at 2.) At the hearing, Berube provided testimony concerning ongoing developments with the family. (*Id.*) Based on improved circumstances,[3] the court determined that M.M. and A.F. could return home to Plaintiff and Fey, who were still residing together, while the other two children would remain in their respective placements. (*Id.* at 4.)

On October 25, 2012, however, CYF received further reports of domestic violence and physical abuse within the home. (*See* Pl.'s I, Docket No. 69-6, at 17.) Based on these reports, CYF caseworker Aurelia Brooks and supervisor Ken Minefield filed an application for emergency custody of M.M. and A.F., which was verbally granted by the state court judge. (*See* Pl.'s Ex. H, Docket No. 69-6 at 10-14; Pl.'s Ex. G, Docket No. 69-6 at 7.) The children were placed with their maternal grandmother and, the following day (*i.e.,* October 26, 2012), Berube and Tennant submitted shelter care applications for M.M. and A.F. (Pl.'s Ex. I, Docket No. 69-6 at 15-18; Pl.'s Ex. J, Docket No. 69-6 at 19-22.)

Three days later, on October 29, 2012, the court held a shelter hearing, which Plaintiff attended with her attorney. (*See* Pl.'s Ex. K, Docket No. 69-6 at 24.) Berube also appeared at the hearing and provided testimony concerning the events that caused CYF to seek the children's removal. (*Id.* at 24-29.) Plaintiff reportedly agreed at that time that the children should remain in shelter care, and she requested that they be placed with a couple when she knew. The court declined this request and ordered that M.M. and A.F. remain with their maternal grandmother, along with B.H. (*Id.*)

---

[3] State court records indicate that social services agencies continued to work with the family during this time. (*See* Pl.'s Ex. F, Docket No. 69-6 at 2-5.) The records indicate that Plaintiff had undergone parenting classes and domestic violence counseling, while Fey had completed an anger management program and parenting classes. (*Id.* at 3.) An agent from "Family Resources/ In-Home services" had worked closely with the family in their home several times each week and reportedly was satisfied that there were no continued safety concerns at that time. (*Id.*)

Ultimately, M.M. and B.H. were adopted by their maternal grandmother following a termination of Plaintiff's parental rights. (DCSMF ¶34; Def.'s Ex. H, Docket No. 66-2, at pp. 26-27; Pl.'s Ex. U, Docket No. 69-10 at 2-27.) A.F. was eventually reunified with Fey. (DCSMF ¶35; Defs.' Ex I, Docket No. 66-2, at p. 29.) J.H. was eventually returned to Plaintiff's custody after lengthy court proceedings and a determination by the state court that Plaintiff had substantially complied with the court-approved plan for reunification. (DCSMF ¶36; Defs.' Ex. I, Docket No. 66-2 at p. 31; *see* also Docket No. 33-3 at pp. 1-2.) There is no indication in the record that Plaintiff ever appealed these orders of the state family court.

## III.    PROCEDURAL HISTORY

Plaintiff filed this lawsuit on January 7, 2013 during the pendency of the family court proceedings. On January 22, 2013, she filed an amended complaint (Docket No. 6), which became the operative pleading in this case.

On July 27, 2016, this Court entered a memorandum opinion (Docket No. 39) and order (Docket No. 40) which disposed of certain claims in the amended complaint, allowed other claims to proceed, and permitted a period for further amendment. Plaintiff declined further amendment and, as a result, the amended complaint remains the operative pleading in this litigation. Based on the Court's July 27, 2016 ruling, the only remaining claims in the case are: (i) §1983 claims asserted against Berube and Tennant in their individual capacities for alleged Fourth and Fourteenth Amendment violations; and (ii) a state law claim for intentional infliction of emotional distress.

Defendants filed their Rule 56 motion (Docket No. 65) on February 13, 2017 as to all of the remaining claims. Contemporaneously, they filed a concise statement of material fact (Docket No. 66) and supporting brief (Docket No. 67).

Plaintiff filed a response in opposition (Docket No. 68), a concise statement of material facts (Docket No. 69), and supporting exhibits (Docket Nos. 69-1 through 69-11) on March 17, 2017. Based on her filings, this Court discerns that Plaintiff is basing her claims on a number of multifaceted objections. As a general matter, Plaintiff asserts that "[t]he state proceedings in their entirety are in question." (Pl.'s Opp. Mot. Summ. J. at 1, Docket No. 68.) More particularly, she contends that CYF and/or its agents did not meet their burden of proof or produce sufficient evidence to justify the separation of her from her children or the termination of her parental rights. She objects generally to the fact that the agency advocated her separation from Fey and her departure from Fey's house as a condition to getting her children back. She complains that her children had to witness her reputation being attacked in the course of the state proceedings. She claims that she now suffers an "emotional disconnection" from her children. (Pl.'s Opp. Mot. Summ. J. at 2.) With respect to Berube's February 22, 2012 in-home visit, Plaintiff contends that the search of the second floor area was nonconsensual. With respect to the March 12, 2012 removal of the children, Plaintiff maintains that Berube did not conduct a sufficient pre-removal investigation or show Plaintiff a copy of the court's emergency custody order.

Despite the disjointed nature of Plaintiff's assertions, the Court finds that the issues are sufficiently joined for purposes of resolving the pending motion. Its analysis follows.

## IV. STANDARD OF REVIEW

A grant of summary judgment is appropriate when the moving party establishes "'that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Heffernan v. City of Paterson*, 777 F.3d 147, 151 (3d Cir. 2015) (quoting Fed. R. Civ. P. 56(a)). A genuine dispute of material fact is one that could affect the outcome of

litigation. *Willis v. UPMC Children's Hosp. of Pittsburgh*, 808 F.3d 638, 643 (3d Cir. 2015) (citing *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986)). However, "'[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial.'" *N.A.A.C.P. v. N. Hudson Reg'l Fire & Rescue*, 665 F.3d 464, 475 (3d Cir. 2011) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986)).

The initial burden is on the moving party to adduce evidence illustrating a lack of genuine disputes. *Hugh v. Butler Cty. Family YMCA*, 418 F.3d 265, 267 (3d Cir. 2005) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)). Once the moving party satisfies its burden, the non-moving party must present sufficient evidence of a genuine dispute in rebuttal. *Santini v. Fuentes*, 795 F.3d 410, 416 (3d Cir. 2015) (citing *Matsushita Elec. Indus. Co*., 475 U.S. at 587). When considering the parties' arguments, the Court is required to view all facts and draw all inferences in the light most favorable to the non-moving party. *Id.* (citing *United States v. Diebold, Inc*., 369 U.S. 654, 655 (1962)). Further, the benefit of the doubt will be given to allegations of the non-moving party when in conflict with the moving party's claims. *Bialko v. Quaker Oats Co*., 434 F. App'x 139, 141 n.4 (3d Cir. 2011) (citing *Valhal Corp. v. Sullivan Assocs*., 44 F.3d 195, 200 (3d Cir. 1995)).

Nonetheless, a well-supported motion for summary judgment will not be defeated where the non-moving party merely reasserts factual allegations contained in the pleadings. *Betts v. New Castle Youth Dev. Ct*r., 621 F.3d 249, 252 (3d Cir. 2010) (citing *Williams v. Borough of West Chester*, 891 F.2d 458, 460 (3d Cir. 1989)). The non-moving party must resort to affidavits, depositions, admissions, and/or interrogatory answers to demonstrate the existence of a genuine dispute. *Guidotti v. Legal Helpers Debt Resolution, L.L.C*., 716 F.3d 764, 773 (3d Cir. 2013)

(citing *Celotex Corp.*, 477 U.S. at 324). "[U]nsubstantiated arguments made in briefs or at oral argument are not evidence to be considered." *Versarge v. Twp. of Clinton*, 984 F.2d 1359, 1370 (3d Cir. 1993) (citing *Bell v. United Princeton Props., Inc.*, 884 F.2d 713, 720 (3d Cir. 1989)).

In this case, Plaintiff is proceeding *pro se.* Consequently, we must interpret her filings in a liberal manner. *See Ray v. Township of Warren*, 626 F.3d 170, 173 (3d Cir. 2010); *Renchenski v. Williams*, 622 F.3d 315, 337 (3d Cir. 2010). Nevertheless, Plaintiff is still required to comply with the Federal Rules of Civil Procedure and the local rules of this Court. *See Schock v. Baker,* 663 F. App'x 248, 252 (3d Cir. 2016) ("Although the [plaintiffs'] pleadings are read with some leeway in light of their pro se status, they were still required to comply with Rule 56.") (citing *Mala v. Crown Bay Marina, Inc.,* 704 F.3d 239, 245 (3d Cir. 2013)); *Mearin v. Folino*, 654 F. App'x 58, 61 (3d Cir.), *cert. denied*, 137 S. Ct. 576, 196 L. Ed. 2d 453 (2016) (court noting that, "even with the leniency due *pro se* litigants, [plaintiff] could expect to be held to the local rules surrounding summary judgment motion practice"); *Mertz v. Harmon,* Civil Action No. 15-6627, 2017 WL 930303, at *5 (E.D. Pa. Mar. 9, 2017) ("Although Plaintiff is proceeding pro se, that does not eliminate his obligation to comply with Rule 56.").

## V.    DISCUSSION

### A.  Plaintiff's Claims Under 42 U.S.C. §1983

Plaintiff's Amended Complaint asserts claims against Berube and Tennant pursuant to 42 U.S.C. § 1983, an enabling statute that provides a federal remedy for the violation of federal constitutional or statutory rights. *Gruenke v. Seip*, 225 F.3d 290, 298 (3d Cir. 2000). To state a claim under section 1983, a plaintiff must allege that a defendant acting under color of state law deprived the plaintiff of a federal constitutional or statutory right. *Id.*

11

Because the Defendants do not dispute their status as state actors, the Court's analysis will focus solely on whether there is evidence that they violated Plaintiff's federal rights. More specifically, we must determine whether the record can reasonably support a finding that the Defendants violated Plaintiff's rights under either the Fourth or Fourteenth Amendments. Preliminarily, the Court must address whether there are limits on its subject matter jurisdiction and/or whether the Defendants are immune from liability in this matter. We address these issues seriatim.

### 1. ROOKER-FELDMAN DOCTRINE

The *Rooker–Feldman* doctrine[4] holds that "federal courts lack jurisdiction over suits that are essentially appeals from state-court judgments." *Great W. Mining & Mineral Co. v. Fox Rothschild LLP*, 615 F.3d 159, 166 (3d Cir. 2010). Application of the doctrine is restricted to "cases brought by state-court losers complaining of injuries caused by state-court judgments . . . and inviting district court review and rejection of those judgments." *Exxon Mobil Corp. v. Saudi Basic Industries Corp.*, 544 U.S. 280, 284 (2005). In order for the doctrine to apply, it must be shown that: (1) the federal plaintiff lost in state court; (2) the plaintiff is complaining of injuries caused by the state-court judgment; (3) the judgment was rendered before the federal suit was filed; and (4) the plaintiff is inviting the district court to review and reject the state judgments. *Great W. Mining*, 615 F.3d at 166 (internal quotation marks omitted)(quoting *Exxon Mobil*, 544 U.S. at 284). "The second and fourth requirements are the key to determining whether a federal suit presents an independent, non-barred claim." *Id.* at 166.

In its prior Memorandum Opinion entered on July 27, 2016 (Docket No. 39), this Court discussed the *Rooker-Feldman* doctrine as it applies to this case. Relevantly the Court observed

---

[4]    *See Rooker v. Fidelity Trust Co.*, 263 U.S. 413 (1923), and *District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462 (1983).

that it "cannot review, negate, or provide relief that would otherwise invalidate the state court's custody or adoption orders." (Mem. Op. at 10-11 (citing *Bass v. New Jersey*, 649 F. App'x 255, 258 (3d Cir. 2016) (*Rooker-Feldman* required dismissal of plaintiff's complaint about the loss of his parental rights, where plaintiff's injuries flowed from state court judgment and awarding relief would require the district court to invalidate the state court's judgment); *Khalil v. New Jersey Div. of Child Protection and Permanency*, 594 F. App'x 88, 91 (3d Cir. Feb. 4, 2015) (where it was "impossible" for federal court to grant plaintiff's relief without concluding that the foundation for the state court's opinion terminating plaintiff's parental rights was incorrect, thereby rejecting its judgment, plaintiff's claim was barred by *Rooker-Feldman*); *Santos v. Sec'y of D.H.S.*, 532 F. App'x 29, 32 (3d Cir. April 24, 2013) (affirming dismissal on *Rooker-Feldman* grounds "[t]o the extent that Santos seeks an order granting him custody of his children and reinstating his parental rights"); *Young v. Dubow*, 411 F. App'x 456 (3d Cir. 2011) (affirming dismissal of complaint filed by mother against all entities and persons connected to state court proceedings that had awarded child custody to father); *Johnson v. City of New York*, 347 F. App'x 850, 852 (3d Cir. 2009) (affirming district court's dismissal of plaintiff's claims that child services improperly removed his children for abuse and neglect, because *Rooker-Feldman* doctrine barred review); *White v. Supreme Court of N.J.*, 319 F. App'x 171, 173 (3d Cir. 2009) (affirming district court's refusal to hear child custody case under *Rooker-Feldman*); *Rodriguez v. Montgomery Cty. Office of Children and Youth*, Civil Action No. 15-6186, 2016 WL 2897470, at *4 (E.D. Pa. May 17, 2016) (holding that *Rooker-Feldman* barred review of plaintiff's claim for injunctive and declaratory relief that essentially asked the federal court to find state court's dependency determination to be incorrect)).)

In her response in opposition to the pending summary judgment motion, Plaintiff argues, in part, that CYF and/or its agents did not meet their burden of proof or produce sufficient evidence to justify the separation of her from her children or the termination of her parental rights. (*See* Pl.'s Opp. Mot. Summ. J. at 2-3, ¶4, Docket No. 68, ("Defendant Berube and agency did not meet burden of proof or show sufficient evidence to keep children from Plaintiff during state proceedings."); *id.* at 4, ¶8 ("Defendants . . . did not meet their burden of proof to keep me from regaining my children."); *id.* ("My children were taken from me unjustified[ly]. The agency did not have evidence to support the [termination of parental rights] process. Defendants do not have the evidence to support their case to suggest otherwise."). Plaintiff insists "it was proven[,] even in clinical evaluations by a clinical psychologist provided by CYF, that [she] should [have] had all children returned without question or stipulation . . . ." (Pl.'s Opp. Mot. Summ. J. at 2, ¶3.) Elsewhere in her response, Plaintiff objects to the "ratio" of children that were returned to her. (*See id.* 2, ¶3 ("What also [is] in question is the ratio of children that were returned[.]"); *id.* at 4, ¶8 ("The goal was for Plaintiff to gain all her children, not just one.").) As to this point, Plaintiff posits that "Mr. Fey was more in question throughout state proceedings," (*id.* at p. 2, ¶3), yet he was reunited with his only natural child (A.F.); Plaintiff, on the other hand, was ultimately reunited with only one of her four children despite having "made [the] same percentage of effort" as Fey "to regain the children . . . ." (*Id.* at p.2, ¶3.)

All of the foregoing complaints relate to injuries that are directly traceable to orders previously entered by the state court in the course of emergency custody, dependency or adoption proceedings. In each instance, the court's orders were necessarily predicated upon a determination that the requisite burden of proof had been met. (*See, e.g.,* Def.'s Ex. F, Orders for Emergency Protective Custody, Docket No. 66-2 at 16-9 (stating, in each case, that

"[s]ufficient evidence was presented to prove that continuation or return of the child to the home of Alicia M. Hatfield. . . is not in the best interest of the child."); Def.'s Ex. G, Dependency Adjudication Order, Docket 66-2 at 21-24 (court finding, by "clear and convincing evidence" that each of Plaintiff's children was a "Dependent Child pursuant to the Pennsylvania Juvenile Act at 42 Pa. C.S. §6302 . . . .").)  Thus, in order for this Court to grant Plaintiff relief on the basis of her complaints, this Court would have to, in effect, invalidate the state court's rulings relative to emergency custody matters, dependency, adoption, and the termination of Plaintiff's parental rights.

Under the *Rooker-Feldman* doctrine, however, this Court lacks jurisdiction to entertain claims that are predicated upon an injury caused by a state court order or ruling that was entered prior to the commencement of this federal litigation.  *See Bass,* 649 F. App'x at 258; *Khalil,* 594 F. App'x at 91; *Santos,* 532 F. App'x at 32; *Young,* 411 F. App'x at 458.  Here, Plaintiff filed this lawsuit on January 7, 2013.  Thus, the *Rooker-Feldman* doctrine bars any claims by Plaintiff that are predicated on complaints about adverse removal, custody, or dependency orders entered by the state court prior to January 7, 2013.  As to any such claims, the requirements of the *Rooker-Feldman* doctrine are satisfied because:  (1) Plaintiff "lost" the custody and/or dependency disputes at issue; (2) Plaintiff is complaining of injuries (namely, the separation of herself from her children) that are directly traceable to the adverse rulings; (3) these state court rulings were issued before this lawsuit was commenced; and (4) Plaintiff is essentially inviting this Court to review and reject the state court rulings in question.  Accordingly, to the extent Plaintiff's §1983 claims are predicated on her complaints about the state court's custody or

dependency rulings entered prior to January 7, 2013, those claims fail for lack of subject matter jurisdiction.[5]

## 2. ABSOLUTE IMMUNITY

The Court will next consider whether either Defendant is absolutely immune from liability under §1983 in her role as a child welfare official. *See B.S. v. Somerset Cty.,* 704 F.3d 250, 261 n. 22 (3d Cir. 2013) ("[T]he question of absolute immunity can be addressed as a threshold issue.")

In *Ernst v. Child & Youth Services of Chester County,* 108 F.3d 486 (3d Cir. 1997), the U.S. Court of Appeals for the Third Circuit held that "child welfare workers and attorneys who prosecute dependency proceedings on behalf of the state are entitled to absolute immunity from suit for all of their actions in preparing for and prosecuting such dependency proceedings." *Id.* at 488–89. In so holding, the court extended to child welfare workers the same principles of immunity that have traditionally been applied to criminal prosecutors, noting the following similarities:

> (1) the functions performed by [state child welfare caseworkers] in dependency proceedings are closely analogous to the functions performed by prosecutors in

---

[5]     Some of the adverse rulings of which Plaintiff complains occurred after the commencement of this lawsuit. For example, the state court granted Fey physical and legal custody of A.F. on April 23, 2014. (*See* Defs.' Ex. I, Docket No. 66-2 at 29.) On or around that same date, the court terminated Plaintiff's parental rights relative to B.H. and M.M. (*See* Pl.'s Ex. U, Doc 69-10 at 2; *see also* Docket No. 33-2 at 10 and Docket No. 33-4 at 11 (court noting, in its April 23, 2014 permanency review orders that a termination of parental rights hearing had been scheduled).) Those two children were subsequently adopted by their maternal grandmother in November 2014. (*See* Defs.' Ex. H, Docket No. 66-2 at 26-27.)

      To the extent Plaintiff is complaining of injuries directly related to these rulings, the *Rooker-Feldman* doctrine may not apply, since the subject state court rulings post-date the commencement of this federal litigation, but the claims might nevertheless be subject to dismissal on the independent basis of res judicata. *See Dreibelbis v. Young,* 351 F. App'x 711, 714 (3d Cir. 2009) (where federal lawsuit was filed before state court judgment was entered and the Rooker-Feldman doctrine therefore did not bar federal court's jurisdiction, "preclusion law still governs disposition of the federal action") (citing *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 293 (2005). Under the Full Faith and Credit Act, 28 U.S.C. §1738, federal courts must "'give the same preclusive effect to a state-court judgment as another court of that State would give.'" *See Exxon Mobile,* 544 U.S. at 293 (quoting *Parsons Steel, Inc. v. First Alabama Bank*, 474 U.S. 518, 523 (1986)). Ultimately, however, this Court need not dwell on the point because, as we discuss more fully *infra,* Plaintiff has failed to adduce evidence showing that Berube or Tennant had involvement in her case after January 2013.

criminal proceedings; (2) the public policy considerations that countenance immunity for prosecutors are applicable to child welfare workers performing these functions; and (3) dependency proceedings incorporate important safeguards that protect citizens from unconstitutional actions by child welfare workers.

108 F.3d at 495. In *B.S. v. Somerset County,* the court further expanded these principles by extending absolute immunity to child welfare employees who formulate and present recommendations to the court relative to child custody determinations that occur *outside* the context of a dependency proceeding. *See* 704 F.3d 250, 265 (3d Cir. 2013).

Absolute immunity comes with an important caveat: the immunity "attaches to actions intimately associated with the judicial phases of litigation, but not to administrative or investigatory actions unrelated to initiating and conducting judicial proceedings." *Odd v. Malone*, 538 F.3d 202, 208 (3d Cir. 2008) (internal quotation marks and citation omitted). A court must therefore perform a "meticulous analysis of [the] actions and functions" of those seeking immunity. *Light v. Haws*, 472 F.3d 74, 79 (3d Cir. 2007); *accord Odd*, 538 F.3d at 208. The key inquiry is whether Berube or Tennant "functioned as the state's advocate when performing the actions that gave rise to the [alleged constitutional] violations [that the plaintiff] seeks to address, or whether those claims instead arose from unprotected administrative or investigatory actions." *B.S.,* 704 F.3d at 265 (internal quotation marks omitted).

Based on the evidence and arguments proffered by Plaintiff in response to the pending motion, and giving her submissions the most generous construction, it appears that Plaintiff's claims against Berube are premised upon the following actions: (i) Berube's walk-through inspection of the Plaintiff's home on February 22, 2012; (ii) Berube's admonition to Plaintiff that if she did not address the issues concerning the condition of the house or find new housing, the children could be removed from the home; (iii) Berube's filing of emergency custody applications on March 12, 2012 without having conducted a more thorough investigation

17

beforehand; (iv) Berube's failure to provide Plaintiff a copy of the state court's March 12, 2012 order authorizing CYF to take the children into emergency protective custody; (v) Berube's involvement in filing dependency petitions on March 15, 2012; (vi) Berube's testimony and/or evidentiary proffers at the dependency hearing; (vi) Berube's involvement in filing shelter care applications for B.H. and M.M. on October 26, 2012 and her participation in the shelter-care hearing; (vii) Berube's participation in the formulation of a permanency plan for the children; and (viii) Berube's attendance at and participation in the permanency plan review hearings.

Applying the principles discussed above, the Court concludes that Berube is not absolutely immune from suit relative to her conduct during the February 22, 2012 walk-through inspection of the Plaintiff's home, because this activity was performed in an investigatory capacity. Similarly, absolute immunity does not apply to Berube's involvement in allegedly failing to conduct an adequate pre-removal investigation and/or failing to provide Plaintiff a copy of the court's March 12, 2012 emergency custody order. Strictly speaking, these limited actions did not involve the actual initiation or prosecution of state custody proceedings, nor did they otherwise involve Berube functioning as the state's advocate.

On the other hand, the rest of Berube's conduct *was* "intimately associated with the judicial phases of litigation." *Odd v. Malone*, 538 F.3d at 208. Accordingly, Berube enjoys absolute immunity with respect to the actions she undertook in connection with petitioning the state court for emergency protective custody of the children, petitioning the court in October 2012 for a shelter hearing, petitioning for a court order of dependency, assisting the court in the formulation of a permanency plan, and/or testifying at the regular permanency plan review hearings. Any recommendations that Berube formulated or presented to the court in connection with these proceedings fall within the scope of absolute immunity.

With regard to Tennant, Plaintiff appears to base her claims on: (i) Tennant's approval of the March 12, 2012 applications for emergency protective custody; (ii) Tennant's approval of the dependency petitions; (iii) the state court's October 25, 2012 order authorizing Tennant to take B.H. and M.M. into emergency protective custody; and (iv) Tennant's approval of Berube's October 26, 2012 shelter care applications. All of these actions involved either the initiation or the prosecution of custody-related proceedings. Because Tennant's conduct was akin to that of a prosecutor and was "intimately associated with the judicial phases of litigation," she is immune from suit. *See Odd,* 538 F.3d at 207 (noting that prosecutorial immunity is "[m]ore than a mere defense to liability," and "embodies the right not to stand trial . . . .") (internal quotation marks and citation omitted).

In contesting the Defendants' immunity, Plaintiff appears to assume that absolute immunity is conditioned upon the Defendants' ability to prove that Plaintiff had actually harmed her children or that she was otherwise noncompliant with the court's permanency plan. (*See* Pl.'s Opp. to Mot. Summ. Judg. at 2, Docket No. 68 ("If Plaintiff had not complied with the agency, did not follower her [Family Services Plan] goal(s) to gain her children, and if Plaintiff indeed was found to have harmed her children[,] then otherwise Defendants would have immunity being that they were able to provide enough substantial evidence.")); *id.* at 2-3 ("Plaintiff had completed all [Family Service Plan] goals, [followed the recommendations of the forensic psychologist], and complied with all court orders in a timely fashion. Plaintiff complied with [the] agency entirely. Therefore[,] Defendant's [sic] do not have immunity."); *id.* at 4 (Defendants do not have immunity in this case being that Plaintiff cooperated fully and did what she had to do to gain her children back.").

Plaintiff's assumption in this regard is mistaken. Defendants' absolute immunity is predicated not on the merits of CYF's concerns about the children's welfare, but on the role in which Defendants functioned when they engaged in the challenged conduct. *See Odd,* 538 F.3d at 208 (discussing the "functional approach" to absolute prosecutorial immunity). Thus, Defendants "enjoy[ ] absolute immunity for actions performed in a judicial or 'quasi-judicial' capacity," *id.*, regardless of the merits of their subjective concerns and regardless even of their motives. As the Third Circuit Court of Appeals explained in *B.S. v. Somerset County*:

> The purpose of according absolute immunity to such officials is to ensure that they "can perform their respective functions without harassment or intimidation." . . . Although conferring absolute immunity obliges courts to sometimes deny relief to those "with valid claims against dishonest or malicious government officials," . . . , the underlying logic is that it is ultimately "better to leave unredressed the wrongs done by dishonest officers than to subject those who try to do their duty to the constant dread of retaliation[.]"

*B.S. v. Somerset Cty.*, 704 F.3d 250, 261 (3d Cir. 2013) (internal citations omitted).

Based on the foregoing considerations, Tennant has met her burden of demonstrating that she is entitled to absolute immunity. Berube is also entitled to absolutely immunity, except with respect to her conduct on February 22, 2012, her allegedly insufficient pre-removal investigation, and her failure on March 12, 2012 to provide Plaintiff a copy of the emergency protective custody order.

### 3. DEFENDANTS' LACK OF INVOLVEMENT IN POST-JANUARY 2013 ACTIVITY

In order to establish a defendant's personal liability under §1983, a plaintiff must show that the defendant was personally involved in the deprivation of his or her federal rights. *See Valdez v. Danberg*, 576 F. App'x 97, 100 (3d Cir. 2014) ("It is well–established that an individual government defendant in an action under § 1983 must have had some personal involvement in the alleged wrongdoing to be held liable.") (citing *Evancho v. Fisher*, 423 F.3d

347, 353 (3d Cir. 2005)).  Thus, Plaintiff must demonstrate that Berube and Tennant were personally involved in the deprivation of her rights.

Here, Plaintiff appears to base her claims on perceived wrongs that she suffered throughout the entirety of her state court proceedings.  (*See, e.g.,* Pl.'s Opp. to Mot. Summ. J., Docket No. 68 at 1 ("The state proceedings in their entirety are in question."); *id.* at 2 ("Defendant Berube and agency did not meet burden of proof or show sufficient evidence to keep children from Plaintiff during state proceedings.").)  As previously noted, this includes the involuntary termination of her parental rights relative to B.H. and M.M.  (*See id.* at 4, ¶8 ("The agency did not have evidence to support the [termination of parental rights] process.").)

Critically, however, Berube has submitted unrebutted evidence that she was removed from Plaintiff's CYF case at some point in January 2013 after the filing of this lawsuit and had no involvement with Plaintiff's case thereafter.  (*See* Berube Decl. at ¶¶ 9, 10.)  Likewise, nothing in the record indicates Tennant's involvement in Plaintiff's case after January of 2013.  Accordingly, to the extent Plaintiff's §1983 claims are predicated on events occurring after January 2013 – such as the termination of Plaintiff's parental rights, the adoption of B.H. and M.M. by their grandmother, or the court's placement of A.F. with Fey, there is no basis in the record upon which Defendants Berube or Tennant can be found liable.  Defendants are therefore entitled to summary judgment on those aspects of Plaintiff's claims.

### 4.  VIOLATION OF A FEDERAL CONSTITUTIONAL OR STATUTORY RIGHT

The Court must next determine whether Plaintiff has produced evidence from which a jury could reasonably find that her federal rights were violated by Berube during the timeframe January 2012 to January 2013, when Berube was the caseworker for Plaintiff's family.  The only

federal rights that are arguably implicated here are Plaintiff's rights under the Fourth and Fourteenth Amendments, which we address in reverse order.

### a. Plaintiff's Fourteenth Amendment Claim

The Fourteenth Amendment prohibits states from, among other things, "depriv[ing] any person of life, liberty, or property, without due process of law." U.S. CONST. amend. XIV, cl. 1. Due process claims can be of a substantive or procedural nature. *See Steele v. Cicchi*, No. 14-3127, 2017 WL 1657542, at *3 (3d Cir. May 3, 2017) (citing *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 845-46 (1998)). For present purposes, the Court will assume that Plaintiff is asserting claims predicated upon alleged violations of both substantive and procedural due process.

### i. Substantive Due Process

Substantive due process rights are those rights which are "fundamental" under the Constitution. *Nicholas v. Pa. State Univ.*, 227 F.3d 133, 139–141 (3d Cir. 2000). "The Supreme Court has recognized a 'fundamental liberty interest of natural parents in the care, custody, and management of their child.'" *Miller v. City of Phila.*, 174 F.3d 368, 373 (3d Cir.1999) (quoting *Santosky v. Kramer*, 455 U.S. 745, 753 (1982)); *see also Anspach v. City of Phila.*,503 F.3d 256, 261 (3d Cir. 2007). "This interest, however, must be balanced against the state's interest in protecting children suspected of being abused." *Miller,* 174 F.3d at 173 (citations omitted).

 "The touchstone of due process is the protection of the individual against arbitrary action of government." *Miller,* 174 F.3d at 374-375 (quoting *Wolff v.McDonnell*, 418 U.S. 539, 558). When a social worker acts to separate parents from their children, "the standard of culpability for substantive due process purposes must exceed both negligence and deliberate indifference, and reach a level of gross negligence or arbitrariness that indeed 'shocks the conscience.'" *Id.* at 375-376. That standard is satisfied if the child is removed without "an objectively reasonable

suspicion of abuse," based on the information available at the time. *Mulholland v. Gov't Cty. of Berks, Pa.,* 706 F.3d 227, 241 (3d Cir. 2013)(quoting *Croft v. Westmoreland Cnty. Children and Youth Servs.*, 103 F.3d 1123, 1126 (3d Cir.1997)). "'Absent such reasonable grounds, governmental intrusions of this type are arbitrary abuses of power.'" *Id.* (quoting *Croft,* 103 F.3d at 1126). The rule applies because "'a state has no interest in protecting children from their parents unless it has some reasonable and articulable evidence giving rise to a reasonable suspicion that a child has been abused or is in imminent danger of abuse.'" *Id.* (quoting *Croft,* 103 F.3d at 1126). "Reasonable suspicion is lacking when a child welfare agency has 'consciously disregarded a great risk that there had been no abuse.'" *Id.* (quoting *Ziccardi v. City of Phila.*, 288 F.3d 57, 66 (3d Cir.2002)).

In this case, the initial deprivation of Plaintiff's liberty interest in custody over her children occurred after Berube, with Tennant's approval, petitioned the state court for emergency protective custody on March 12, 2012. Defendants' actions were predicated, in part, on concerns about the family's unsafe living conditions and a lack of parental cooperation. These concerns were reasonable, given Berube's previous inspection of the residence, her own personal interactions with the family, and the corroborative reports of other social services agents who had worked with the family. Defendants' decision to seek an emergency removal of the children was also driven by objectively reasonable concerns about physical violence within the home. According to Defendants' verified state court petitions (Def.'s Ex. D and E, Docket No. 66-2), CYF had received information on March 10, 2012 from an in-home social services worker that Plaintiff was driving her children around Pittsburgh after stating that she was tired of Fey's abuse and the maltreatment he inflicted on J.H. When Berube subsequently attempted to speak to Plaintiff about the abuse, Plaintiff would not discuss the situation. Plaintiff indicated only that

she had a plan to move out of the house, but she would not share her plan with Berube and hung up on her.  (*See* Docket No. 66-2 at 5 and 12.)  In the absence of a more definitive exit plan from Plaintiff -- or at least a greater degree of cooperation, Defendants had objectively reasonable grounds to suspect that Plaintiff's children would be endangered if they remained in Plaintiff's care.  Consequently, their decision to petition for the children's removal does not "shock the conscience."

To the extent that Plaintiff disputes the Defendants' verified account of the foregoing events, she has not shown the existence of a "genuine" dispute.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (A dispute is genuine if the fact finder could reasonably return a verdict in favor of the nonmoving party with respect to that issue.)  In her brief in opposition to Defendants' motion, Plaintiff denies that she was driving around Pittsburgh on March 10, 2012 in an attempt to escape physical abuse perpetrated by Fey.  In actuality, she claims, she was in Erie, Pennsylvania on a planned vacation with her children.  Plaintiff thus accuses Berube of operating under a "misconception" and faults her for not properly investigating the situation prior to filing the petition for emergency protective custody.  (Pl.'s Opp. Mot. Summ. J. at 3.)

Plaintiff's assertions in this regard do not support the existence of a due process violation.  First, even if Berube was in fact operating under a "misconception," this would not necessarily negate the objective reasonableness of her suspicion that the children were in a potentially unsafe situation.  Second, and more fundamentally, the factual assertions Plaintiff makes in her responsive brief are not evidence, and Plaintiff has failed to provide her own personal account of the March 10 incident in a form of evidence that would be admissible at time of trial, such as deposition testimony or a sworn affidavit.  *See e.g., Arsdel v. Liberty Life Assurance Co. of Boston*, No. CV 14-2579, 2017 WL 1177174, at *3 (E.D. Pa. Mar. 30, 2017) ("[A]rguments

made in briefs 'are not evidence and cannot by themselves create a factual dispute sufficient to defeat a summary judgment motion.'") (quoting *Jersey Cent. Power & Light Co. v. Township of Lacey*, 772 F.2d 1103, 1109-10 (3d Cir. 1985)); *Sumner v. Schreck*, No. CIV.A. 13-1840 JBS, 2015 WL 5646528, at *3 (D.N.J. Sept. 24, 2015) ("[M]ere statements in a brief or memorandum are not 'evidence' and do not constitute facts in opposition to a summary judgment motion."). Instead, to buttress her claim, Plaintiff has proffered the sworn affidavit of Steven Fey (Pl.'s Ex. V, Docket No. 69-11), who attests that Plaintiff told the in-home social services worker, Jennifer Green, about her planned trip to Erie before leaving. (*See* Pl.'s Ex. V, Docket 69-11 at p. 2.) Notably, Fey does not state that Plaintiff informed *Berube* of her intended trip to Erie. While Fey *does* claim that *he personally* told Berube about the Erie trip when Berube called the house to follow up on the report of possible abuse, this hardly shows that Berube "consciously disregarded a great risk that there had been no abuse." *Mulholland*, 706 F.3d at 241. Given the fact that Fey was the alleged perpetrator of abuse, Berube would have been objectively justified in discounting Fey's statement as self-serving and therefore unreliable. Fey also states in his affidavit that Green would "state in court" that: (i) she personally advised Berube of the planned trip to Erie and (ii) she never told Berube that Plaintiff had left the house in order to escape abuse. Critically, however, Plaintiff has not proffered any type of sworn statement from Green that addresses these matters, and Fey's statements as to what Green would say constitutes inadmissible hearsay for Rule 56 purposes. *See* Fed. R. Civ. P. 56(c)(4)("An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.").

In sum, Plaintiff may dispute the reason for her March 10, 2012 departure from the Homestead residence, but she has failed to provide competent evidence showing that Berube or Tennant lacked a reasonable suspicion that the children could face harm if they remained in Plaintiff's custody. Even if the Court assumes that Berube's investigation of the situation should have been more thorough and that her failure in this regard amounted to negligence (a finding the Court does not presently make), this would be insufficient to establish a due process violation. *See Mulholland,* 706 F.3d at 241 (For purposes of substantive due process, "a child welfare agency abridges an individual's substantive due process rights when its actions exceed both negligence and deliberate indifference, and reach a level of gross negligence or arbitrariness that indeed shocks the conscience.") (internal quotation marks omitted).

A second "deprivation" of Plaintiff's liberty interests occurred in October 2012, two months after M.M. and A.F. had been reunified with Plaintiff in connection with the ongoing dependency proceedings. On October 26, 2012, M.M. and A.F. were again removed from the home in Homestead, where Plaintiff and Fey were still residing. State court records indicate that this removal was prompted by reports of physical violence within the home. Specifically, CYF received a report at 11:00 p.m. on October 25, 2012 that Fey had been hitting M.M. in the stomach with a book, which sometimes resulted in her throwing up. (Pl.'s Ex. I, Docket No. 69-6 at17; Pl.'s Ex. J, Docket No. 69-6 at 21.) It was further reported that Plaintiff and Fey had been in a verbal altercation which culminated in them throwing items at one another. (*Id.*) Finally, it was reported that Fey was physically hurting J.H. during his weekend visits, most recently by twisting J.H.'s arm. The reporting source informed CYF that the abuse had been ongoing from the time that M.M. and A.F. were returned to the home. (*Id.*) As Plaintiff points out, there was no allegation that Plaintiff herself had perpetrated abuse upon the children, nor

was there any allegation of harm to A.F.  Nevertheless, Defendants filed an application for a shelter hearing to have M.M. and A.F. returned to their maternal grandmother based on these reports.  After holding a hearing, the state court granted the application.

For the reasons previously discussed, Defendants are immune from suit based on actions they took in petitioning the state court for a shelter hearing and a return of M.M. and A.F. to their maternal grandmother.  Putting that conclusion aside, however, there is nothing about Defendants' conduct relative to the October 26, 2012 removal of M.M. and A.F. that shocks the conscience.  The reports of physical violence within the home were adequate to support a reasonable suspicion of harm to the children – including A.F., even if she was not personally suffering from alleged physical abuse.  Plaintiff does not appear to dispute that the report of abuse was made to CYF as outlined in the state court records.  In addition, the state court records show that Plaintiff agreed that the children should remain in foster care; she simply advocated (unsuccessfully) that M.M. and A.F. be placed with a couple that she knew, rather than with their grandmother.  (*See* Pl.'s Ex. K, Docket No. 69-6 at 25.)  To the extent Plaintiff is now objecting that Berube should have conducted a more thorough investigation prior to filing the shelter hearing application, this omission on her part simply does not rise to the level of conscience-shocking conduct.

In sum, in each instance where a liberty deprivation occurred, the evidence, even when construed in the light most favorable to Plaintiff, compels the conclusion that Defendants had an objectively reasonable suspicion of neglect or potential harm to the children that warranted their removal from Plaintiff's custody.  Because the record does not reasonably support a finding that Defendants engaged in conduct that would "shock the conscience," Plaintiff cannot prevail on her substantive due process claim.

### ii) Procedural Due Process

To state a Section 1983 claim for deprivation of procedural due process, a plaintiff must allege that: (1) he or she was deprived of an individual interest that is encompassed within the Fourteenth Amendment's protection of life, liberty or property; and (2) the procedures available did not provide due process of law. *Alvin v. Suzuki*, 227 F.3d 107, 116 (3d Cir. 2000). In this case, the first element is satisfied because, as previously noted, Plaintiff had a constitutionally cognizable liberty interest in the care, custody, and management of her children. *See Miller, Miller v. City of Phila.*, 174 F.3d 368, 374 (3d Cir. 1999). The question thus becomes whether the procedures available to Plaintiff provided her due process of law.

"[T]he fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." *Miller*, 174 F.3d at 373 (internal quotations omitted). Our circuit court of appeals has held that that initiating child custody proceedings by *ex parte* order is generally constitutional so long as a prompt post-deprivation hearing is held. *See Miller,* 174 F.3d at 372 n. 4; *see also B.S. v. Somerset Cty.,* 704 F.3d at 273 (parents have a procedural due process right "to be promptly heard" after the state forces the removal of their child).

Here, there is no question that Plaintiff received a post-deprivation shelter hearing within two days after her children were removed from her custody on March 12, 2012. Plaintiff was admittedly represented by counsel at that hearing, and there is no claim that she was denied an opportunity to be heard. Thus, no procedural due process deprivation occurred in connection with the initial removal of her children. Similarly, Plaintiff attended a shelter hearing with her attorney within a few days after the removal of her children in October 2012. In both cases, Plaintiff's procedural due process rights were satisfied.

Plaintiff appears to base her procedural due process claim, in part, on the allegation that Berube never gave her a copy of Judge Bubash's March 12, 2012 order authorizing the removal of her children. However, there is unrebutted evidence in the record that Plaintiff provided notice of the Order to Fey, as he was the guardian present at the house when Berube initially arrived. (*See* Berube Decl. at ¶8(d); Pl.'s Ex. V, Docket No. 69-11 at p. 3.) Berube attests that she also explained the order and the purpose of her presence to Fey. (Id. ¶8(c).)

The Court is satisfied that, in doing so, Berube complied with the mandates of due process, which requires only that the means employed to provide notice be such as one "desirous of actually informing" the person would reasonably adopt to accomplish notice. *Jones v. Flowers*, 547 U.S. 220, 229 (2006) (quoting *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 315 (1950)); *see also Win & Son, Inc. v. City of Phila.,* 162 F.Supp.3d 449, 461 (E.D. Pa. 2016). It is undisputed that Plaintiff attended the March 14, 2012 shelter hearing and had an opportunity to express her position concerning the custody of her children through her counsel. Thus, Plaintiff has failed to produce evidence of a procedural due process deprivation.

### b. *Plaintiff's Fourth Amendment Claim*

Plaintiff also contends that Berube violated her Fourth Amendment rights when she inspected and photographed the second floor of the family's home on February 22, 2012. While Plaintiff does not dispute that Berube's initial entry into the home and inspection of the downstairs area was lawful, she contends that Berube did not have a valid basis to inspect the second floor, which was then under repair and inaccessible. Berube maintains that her entry into the second floor area was consensual. In the alternative, Berube contends that she is entitled to qualified immunity.

The Fourth Amendment ensures, among other things, that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ." U.S. CONST. amend. IV. "The touchstone of the Fourth Amendment is reasonableness." *Florida v. Jimeno*, 500 U.S. 248, 250 (1991); *United States v. Price*, 558 F.3d 270, 277 (3d Cir. 2009) ("[T]he Fourth Amendment does not prohibit all searches—only those that are unreasonable.") (citing *Illinois v. Rodriguez*, 497 U.S. 177, 183 (1990)).

"It is a basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable." *Payton v. New York*, 445 U.S. 573, 586 (1980) (internal quotations omitted). However, an exception to the warrant requirement exists where there is consent to search. *Schneckloth v. Bustamonte*, 412 U.S. 218, 223 (1973). Consent can be either express or implied, and "the standard for measuring the scope of a [subject's] consent under the Fourth Amendment is that of 'objective' reasonableness—[i.e.,] what would the typical reasonable person have understood by the exchange between the officer and the [subject]?" *Florida v. Jimeno*, 500 U.S. 248, 251 (1991).

For consent to be voluntary, it cannot be the "product of duress or coercion, express of implied." *Schneckloth*, 412 U.S. at 227. Where the government seeks to justify a search based on consent, it "has the burden of proving that the consent was, in fact, freely and voluntarily given." *Bumper v. North Carolina*, 391 U.S. 543, 548 (1968). This burden "is not satisfied by showing a mere submission to a claim of lawful authority." *Florida v. Royer*, 460 U.S. 491, 497 (1983). "Voluntariness is a question of fact to be determined from all the circumstances." *Id.* at 248–49; *United States v. Price*, 558 F.3d 270, 284 (3d Cir. 2009).

In her sworn affidavit, Berube states that Fey consented to her entry into the family home on February 22, 2012 (Berube Decl. ¶7(b) and (c)), and Plaintiff does not contend otherwise.

(*See* Pl. Depo. 45:5-9, 46:11-14.)  Berube further states – and Plaintiff does not deny – that Fey accompanied Berube as she conducted her walk-through inspection and never asked her to leave. (*See* Berube Decl. ¶7(c) and (d); Pl.. Depo. 48:7-10, 54:3-5.)  Citing Plaintiff's testimony, Defendants contend in their Concise Statement of Material Facts, that Berube's walkthrough included the second floor of the home and that Fey voluntarily removed the physical barrier to the second floor.  (DCSMF ¶¶17-18 (citing Pl.'s Dep. at 54:14-21).)

Plaintiff contends, however, that Berube's inspection of the second floor area was nonconsensual.  At her deposition, Plaintiff testified as follows:

> [Berube] did ask about the second floor.  I said, well, you can't go up the second floor because it's blocked for access.  It would be hard for you.  And that's when she said, well, if you can't cooperate, we will – we can potentially take your children.  So ever since then, you know, Steve complied with her request to take the material down so she can go upstairs.  We told her that nobody lives up there, nobody goes up there, and we just left it alone until we gain more funds to finish it.  And she would keep persisting about going upstairs.  That's when the conversation started getting heated.  Because I was like there's no reason for you to be up there when nobody lives there or occupies the areas.

(Pl. Depo. at 48:10-49:1.)  In support of her Fourth Amendment claim, Plaintiff has proffered the sworn affidavit of Fey, who states:

> The last time we had contact with CYF was with a case worker by the name of Amanda . . . During this time period, case worker Amanda would DEMAND to see the second floor of the home.  I would repeatedly tell her that I could not permit that because it was under construction and we had no insurance.  If she were to be hurt, I had no coverage to pay the medical expenses.  She advised me that she needed to see the second floor and if not she may have to get [a] court order to remove [the] children.  Under threat of losing our children I complied and took down the plywood wall blocking the entrance to the second floor.

(Pl.'s Ex. V, Docket No. 69-11 at p. 2.)  Plaintiff concedes that, at no point did she tell Berube that she was "absolutely not allowed to go upstairs" (Pl. Depo. at 54:14-16.)  Rather, she and Fey "just explained to her it was blocked for access and it would not be easy to go upstairs."  (*Id.* at 54:16-18.)  Concerning the potential threat of removal proceedings, Plaintiff testified as follows:

Q. Do you remember anything that [Berube] said specifically other than trying to explain?

A. Only her again saying if we do not cooperate we can have your children removed from the home.

Q. At that point, is that how it was stated?

A. Yes, because we kept saying we didn't want the children removed and it was explained again. Steve mentioned that same thing. And it was phrased the same way with him.

Q. Okay. So it was phrased that day and how Steve related to you it was phrased as though if you don't comply, removal is an option, could happen, that sort of thing?

A. Yes.

(Pl. Depo. at 55:13-56:2.)

Based on the evidence currently of record, the Court perceives a genuinely disputed issue of material fact as to whether Berube's warrantless search of the second floor of Plaintiff's home on February 22, 2012 was consensual. Viewing the evidence of record in the light most favorable to Plaintiff, a jury could reasonably conclude that the consent that Plaintiff and Fey gave to search the home was limited in scope and did not extend to the upstairs area. To the extent Fey ultimately acceded to Berube's request that she be permitted to access that area, a jury could reasonably find that Fey's "consent" was not freely and voluntarily given. A jury could reason that Fey had acted under the duress of a coercive threat that the couple would lose custody if they did not succumb to Berube's wishes.

Even so, however, the Court must consider whether Berube is qualifiedly immune from liability. Qualified immunity protects government officials from insubstantial claims in order to "shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Mammaro v. New Jersey Div. of Child Prot. & Permanency*, 814 F.3d 164, 168–69 (3d Cir.), *as amended* (Mar. 21, 2016), *cert. denied*, 137 S. Ct. 161, 196 L. Ed. 2d 121 (2016)

(quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). "'When properly applied, it protects all but the plainly incompetent or those who knowingly violate the law.'" *Id.* (quoting *Ashcroft v. al–Kidd*, 563 U.S. 731, 131 S. Ct. 2074, 2085 (2011)). In order to overcome qualified immunity, a plaintiff must come forward with facts "showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Id.* at 168-69 (quoting *al-Kidd*, 131 S. Ct. at 2080).

"A Government official's conduct violates clearly established law when, at the time of the challenged conduct, '[t]he contours of [a] right [are] sufficiently clear' that every 'reasonable official would have understood that what he is doing violates that right.'" *al-Kidd*, 131 S. Ct. at 2083 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). "'In other words, there must be sufficient precedent at the time of action, factually similar to the plaintiff's allegations, to put defendant on notice that his or her conduct is constitutionally prohibited.'" *Mammaro*, 814 F.3d at 169 (quoting *McLaughlin v. Watson*, 271 F.3d 566, 572 (3d Cir. 2001)). To make this determination, courts look first for applicable Supreme Court precedent; if none exists, courts may rely on a "'robust consensus of cases of persuasive authority' in the Court[s] of Appeals" that clearly establishes the right in question. *Mirabella v. Villard*, 853 F.3d 641, 648 (3d Cir. 2017) (quoting *Mammaro*, 814 F.3d at 169) (alteration in the original); *see also Taylor v. Barkes*, —— U.S. ——, 135 S. Ct. 2042, 2044 (2015) (*per curiam*).

In the context of this case, the question becomes whether clearly established law, such as it was on February 22, 2012, would have put Berube – and every other reasonable social worker – on notice that her warrantless search of the second floor area would violate Plaintiff's Fourth Amendment rights. Stated differently, the question is whether reasonable officials in Berube's position would know that a warrantless search of the second floor, conducted with the ostensible

consent of the parent/occupants -- but also under the cloud of possible child removal proceedings, would render the parent/occupants' consent invalid and thereby violate their Fourth Amendment rights.

Neither side to this litigation has cited relevant case law that addresses this question. Moreover, this Court's own research has not uncovered any applicable Supreme Court precedent on point, nor has it uncovered a "'robust consensus of cases of persuasive authority' in the Court[s] of Appeals." *Mirabella,* 853 F.3d at 648.

One decision of potential relevance is *Croft v. Westmoreland Cty. Children and Youth Servs.,* 103 F.3d 1123 (3d Cir. 1997). In that case, the Third Circuit Court of Appeals held that the forced separation of a father from his wife and child under the terms of a temporary safety plan constituted an arbitrary abuse of power by the child welfare official and violated the father's substantive due process rights, because the official who perpetrated the separation "lacked objectively reasonable grounds to believe the child had been sexually abused or was in imminent danger of sexual abuse." *See Croft,* 103 F.3d at 1127. Notably, the social worker in that case had issued an "ultimatum" to the father that, "unless [he] immediately left his home and had no contact with his daughter [pending the outcome of the investigation], [the social worker] would remove [the child] from the home that very night and place her in foster care." 103 F.3d at 1124-1125. In a footnote, the court "explicitly reject[ed]" the defendant's argument that the father had left his home voluntarily – a situation which would have obviated the need for any due process analysis. 103 F.3d at 1125 n.1. The court reasoned that "[t]he threat that unless [the father] left his home, the state would take his four-year-old daughter and place her in foster care was blatantly coercive." 103 F.3d at 1125 n.1.

Arguably, the decision in *Croft* is supportive of Plaintiff's Fourth Amendment claim insofar as the *Croft* court determined that the "blatantly coercive" threat of child removal proceedings in that case rendered the father's participation in the family safety plan involuntary. Yet, to the extent *Croft* is relevant to this Court's qualified immunity analysis, it is distinguishable in important respects. First, the discussion of removal proceedings in *Croft* arose in the context of a substantive due process claim and, specifically, in the context of a question as to whether the child welfare agency had acted arbitrarily and in a "conscience-shocking" manner by essentially forcing the father's removal from the home in the absence of evidence to support a reasonable suspicion that the child had been abused or was in imminent danger of abuse. This case, by contrast, involves a question as to the voluntariness of consent in the context of a home search that implicates Fourth Amendment rights. Second, the threat of removal proceedings in *Croft* was arguably more coercive than in this case. According to both Plaintiff and Fey, Berube merely alluded to the possibility of commencing removal proceedings; however, in *Croft,* the social worker issued an "ultimatum" to the father that, "unless [he] immediately left his home and had no contact with his daughter [pending the outcome of the investigation], [the social worker] would remove [the child] from the home that very night and place her in foster care." 103 F.3d at 1124-1125.

Aside from these factual distinctions, other aspects of the *Croft* decision inform this Court's qualified immunity analysis. It is noteworthy that the issue of possible coercion was not the central focus of the court's analysis; and to the extent the court addressed this issue, its discussion consisted of one statement relegated to a footnote. Importantly, the court did not hold that every invocation by a social worker of the possibility of removal proceedings is inherently coercive as a matter of law.

Finally, it is significant that other courts of appeals have ruled – both before February 22, 2012 and after – that the potential threat of removal proceedings does not necessarily render a parent's consent to a safety plan involuntary. In *Dupuy v. Samuels*, 465 F.3d 757 (7th Cir. 2006), for example, the Seventh Circuit Court of Appeals held that, when a parent voluntarily consents to a safety plan, no hearing of any kind is necessary for due process purposes. *See* 465 F.3d at 761 ("There is no right to a hearing when no substantive right has been infringed or is threatened with being infringed."). In *Dupuy*, the court upheld the State of Illinois' safety plan program and rejected the plaintiffs' argument that the plans were inherently nonconsensual because they were entered into under the threat of formal removal proceedings. The court reasoned that:

> It is not a forbidden means of "coercing" a settlement to threaten merely to enforce one's legal rights. If you sue and before judgment settle because the defendant is willing to settle on more favorable terms than you expect to obtain from pressing the suit to judgment, you've obtained a favorable settlement on the basis of an implicit threat to litigate to an outcome that would make the defendant worse off than if he settled; but you have not infringed any right of his. Coercion is objectionable—and when objectionable is more aptly described as duress or extortion—when illegal means are used to obtain a benefit.

465 F.3d at 762. The Seventh Circuit found the situation in *Croft* to be factually distinguishable and illustrative of the principle:

> The defendant's case worker [in *Croft*], suspecting that a father was abusing his child but having no objective basis for the suspicion, gave the father an "ultimatum" that if he didn't leave the family home immediately, the agency would place the child in foster care. The court held the threat improper on the ground that the case worker did not have adequate grounds for removing the child from the parents' custody even temporarily. The threat was not grounded in proper legal authority. The coercion about which the plaintiffs complain in this case does not include such ultimata; the consent form informs the parents of the possibility that the child will be removed—information that is in the nature of a truism.

465 F.3d at 763.

Other courts of appeals have adhered to this approach. As recently as 2016, the Sixth Circuit Court of Appeals ruled that "officials do not violate clearly established First Amendment or Fourteenth Amendment rights by threatening removal proceedings in order to secure parents' consent to the temporary placement of their children." *Schattilly v. Daugharty*, 656 F. App'x 123, 129-130 (6th Cir. 2016).

In sum, this Court has found no "robust consensus of cases of persuasive authority" in the Courts of Appeals that clearly established the unconstitutionality of Berube's conduct as of February 22, 2012. Because this Court cannot say that every reasonable official in Berube's position would have understood that Berube's conduct violated Plaintiff's Fourth Amendment rights, *al-Kidd*, 131 S. Ct. at 2083, Berube is entitled to qualified immunity.

### c. *Plaintiff's Supervisory Claims Against Tennant*

As noted, Plaintiff has asserted claims against Tennant in her personal capacity as Berube's supervisor. In order to maintain a § 1983 lawsuit against an official in his or her supervisory capacity, a plaintiff must demonstrate that the defendant either personally directed, or at least knew of and acquiesced in, the subordinate's unconstitutional conduct. *Rode v. Dellarciprete*, 845 F.2d 1195, 1207-08 (3d Cir. 1988).

For the reasons previously discussed, Tennant is absolutely immune from suit. In addition, however, Plaintiff has failed to adduce evidence of any Fourteenth Amendment violation. It follows, therefore, that Tennant cannot be found liable for personally directing, or knowingly acquiescing in, the deprivation of Plaintiff's due process rights. Even assuming that Plaintiff could demonstrate a constitutional violation relative to the search of her home on February 22, 2012, no basis for Tennant's liability has been shown. There is no contention that Tennant was present at the house with Berube when the search occurred. (*See* DCSMF ¶37.)

Plaintiff has not presented any evidence to suggest that Berube acted at Tennant's express direction or that Tennant knew of similar conduct on the part of Berube prior to February 22, 2012 and demonstrated a tacit approval of such conduct. Accordingly, Defendant Tennant is entitled to summary judgment on all of Plaintiff's §1983 claims on this independent basis.

B. Plaintiff's State Law Claim for Intentional Infliction of Emotional Distress

Plaintiff has also asserted a claim against Berube and Tennant under Pennsylvania law for intentional infliction of emotional distress. "Such a claim requires, 'at the least, [a demonstration of] intentional outrageous or extreme conduct by the defendant, which causes severe emotional distress to the plaintiff.'" *N'Jai v. Pittsburgh Bd. of Pub. Educ.*, 487 F. App'x 735, 737 (3d Cir. 2012) (quoting *Swisher v. Pitz*, 868 A.2d 1228, 1230 (Pa. Super. Ct. 2005)) (alteration in the original). To establish a basis for liability the conduct in question must be "'so outrageous in character, so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in civilized society.'" *Wilson v. Byanahak Jin,* No. 17-1593, --- F. App'x ---, 2017 WL 2480585, at *5 (3d Cir. June 8, 2017) (quoting *Reeves v. Middletown Athletic Ass'n*, 866 A.2d 1115, 1122 n.5 (Pa. Super. Ct. 2004)). In addition, "'a plaintiff must suffer some type of resulting physical harm due to the defendant's outrageous conduct.'" *N'Jai,* 487 F. App'x at 737 (quoting *Swisher,* 868 A.2d at 1230, and citing *Reedy v. Evanson*, 615 F.3d 197, 231 (3d Cir. 2010) (discussing the state of the law in Pennsylvania regarding intentional infliction of emotional distress claims)); *see also Wilson,* 2017 WL 2480585, at *5.

In light of this standard, Plaintiff's intentional infliction of emotional distress claim cannot survive summary judgment. First, Plaintiff has failed to adduce evidence of intentional conduct on the part of Defendants that was outrageous or extreme. In addition, the record in this

case is devoid of any evidence showing that the Defendants' conduct proximately resulted in physical harm to Plaintiff. Plaintiff's only proffer in this regard is her claim that "[i]t was embarrassing for Plaintiff's children to see how the Plaintiff was affected 'emotionally.'" (Pl.'s Opp. to Mot. Summ. Judg. at 2.) She contends that, as a result of the "countless occasions" where her children had to witness her reputation and past history "repeatedly attacked," she now suffers "an emotional disconnection" from her children. (*Id*.) As unfortunate as this may be, it is insufficient to establish the requisite physical injury.

Because no reasonably jury could find in favor of Plaintiff relative to her intentional infliction of emotional distress claim, Defendants are entitled to summary judgment on that claim.

## VI. CONCLUSION

Based upon the foregoing reasons, Defendants' motion for summary judgment (Docket No. 65) will be granted. An appropriate order follows.


*/s/ Nora Barry Fischer*
Nora Barr Fischer
United States District Judge


Date: June 13, 2017

cc/ecf: Counsel of Record

 Alicia Hatfield
 176 West Hills Drive, Apt. E-17
 Greensburg, PA 15601
 (Regular & Certified Mail)